# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| THE ESTATE OF WILLYS H. FRITZ, DANIEL W. FRITZ, ADMINISTRATOR (on behalf of Leanne G. Fritz, decedent's surviving widow; Daniel W. Fritz, decedent's surviving adult son, and Susan G. Lueder, decedent's surviving adult daughter),<br><br>    Plaintiffs,<br><br>vs.<br><br>BRYSON HENNIGAR and WEST UNION, IOWA,<br><br>    Defendants. | No. C19-2046-LTS<br><br>**MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

## I. INTRODUCTION

This case, which arose from a tragic collision between a law enforcement vehicle and a vehicle operated by a civilian driver, is before me on defendants' motion (Doc. 42) for summary judgment. Plaintiffs have filed a resistance (Doc. 49) and defendants have filed a reply (Doc. 59). Oral argument is not necessary. *See* Local Rule 7(c).

## II. PROCEDURAL HISTORY

Plaintiffs filed this case in the Iowa District Court for Fayette County on June 20, 2019, seeking to recover damages resulting from the death of Willys Fritz (Willys). Doc. 6. Plaintiffs are Willys' son and estate administrator, Daniel Fritz, along with Willys' surviving wife and daughter. *Id.* The state court petition named two defendants: (1) the City of West Union and (2) Bryson Hennigar, a former police officer for West Union. *Id.* Plaintiffs raised state law claims of negligence and recklessness, along with an unconstitutional deprivation of life claim brought pursuant to 42 U.S.C. § 1983. *Id.*

On July 12, 2019, the City filed a notice of removal to this court and a motion to dismiss plaintiffs' negligence claim.[1] Doc. 1. Plaintiffs filed a motion to remand on July 29, 2019, which was denied on November 26, 2019. Doc. 10, 26. On December 11, 2019, plaintiffs filed a first amended complaint, which no longer includes a negligence claim. Doc. 29. Defendants then withdrew their motion to dismiss and filed an answer. Doc. 30–31. On July 31, 2020, defendants filed this motion for summary judgment. Doc. 42.

### III.   SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler*

---

[1] In the notice of removal, the City alleged that Hennigar had not yet been served with notice of the state court action. Doc. 1 at 2, ¶ 9. Hennigar later appeared in this case through counsel and filed a consent to removal. Doc. 15–18. He also joined the motion to dismiss. Doc. 19.

2

*Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 248–49. The party moving for entry of summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. Celotex, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the non-moving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1377 (8th Cir. 1996).

## IV. RELEVANT FACTS

The following facts are undisputed unless otherwise noted.

On July 17, 2017, just before 2:40 p.m., defendant Hennigar received a call from the apartment manager at Westwood Apartments in West Union, Iowa, who reported an argument between tenants and asked for assistance.[2]  Doc. 42-1 at 1–2.  The Westwood Apartments were considered a "problem area" in West Union to which police were frequently called.  *Id.* at 4.  Hennigar had responded to an incident a month earlier, involving the same tenants, that resulted in an arrest.  *Id.*  Hennigar informed dispatch that he was en route to a fight in progress and began driving to the Westwood Apartments.  *Id.* at 2.

After turning northbound on Iowa Highway 150, a two-lane highway, Hennigar accelerated quickly with his lights and siren activated.  *Id.*  Three vehicles were between him and the upcoming intersection of Highway 150 and Highway 18.  One northbound driver saw Hennigar approaching rapidly from behind and quickly pulled off to the side of the road out of fear of getting hit.  Doc. 54 at 4.  As Hennigar passed that northbound vehicle, part of his police SUV crossed over the middle line and into the southbound lane, causing a southbound vehicle on Highway 150 to also quickly pull off the road.  *Id.*  The third vehicle was a pickup truck with a large box over its cargo bed, but it turned right (east) at the intersection before Hennigar reached it.  Doc. 56-1 at 3.  Hennigar does not dispute that vehicles moved off the road as he approached, but he claims they did so to yield the right-of-way to him as required by Iowa law.  Doc. 56-1 at 3.  Hennigar's speed while approaching the intersection is not clear from the record, though estimates for two stretches of highway near where he passed the vehicles came to 44 mph and 51 mph.  Doc. 55-1 at 12; Doc. 55-2 at 157.

---

[2] It appears that the apartment manager's call was directed to Hennigar because she called the business number for the West Union Police Department rather than 911.  Doc. 55-2 at 77, 144.

4

The intersection of Highways 150 and 18 includes a four-way stop and is one of the busiest intersections in West Union. Doc. 54 at 4. Hennigar claims he slowed slightly as he approached the intersection, which was clear, and made eye contact with a driver who was stopped on the east side of the intersection before continuing through it. Doc. 42-1 at 2; Doc. 56-1 at 3. Plaintiffs assert he slowed down little, if at all, before the intersection. Doc. 54 at 3. In any event, Hennigar accelerated through the intersection, reaching speeds as high as 60 mph, and collided with Willys approximately 272 feet north of it. Doc. 42-1 at 3.

Leading up to the accident, Willys was waiting at the stop sign of a business turnoff on the west side of Highway 150. *Id.* He waited for over 15 seconds to let three vehicles pass, one northbound and two southbound. Doc. 54 at 4; BP Video 1, 02:39:34 – 02:39:51 p.m..[3] As the second southbound vehicle was passing, Willys began driving straight across Highway 150 toward a gas station on the opposite side. Doc. 42-1 at 3; BP Video 1, 02:39:51 p.m. A little more than four seconds later, Willys' truck was broadsided by Hennigar's police SUV while crossing the northbound lane of Highway 150. Doc. 42-1 at 3; BP Video 1, 02:39:55 p.m.; Doc. 55-1 at 14. Willys died of injuries sustained from the crash, but the exact timing of his death, and particularly his level of consciousness leading up to it, are disputed.

Crash data retrieval (CDR) software from Hennigar's SUV recorded data up to five seconds before the collision. From five to two seconds before the collision Hennigar's SUV accelerated from 47 mph to 60 mph with the accelerator pedal fully pressed down and the engine throttle at 99%. Doc. 42-1 at 3; Doc. 55-2 at 76. Hennigar removed his foot from the accelerator approximately two seconds before the collision and applied the brakes within half a second later. Doc. 42-1 at 3; Doc. 55-2 at 76. Hennigar's

---

[3] Defendants provided two surveillance camera recordings from the gas station Willys was attempting to reach as part of their summary judgment appendix. All times for the videos refer to the internal clock time on the security recording.

SUV decelerated over the final two seconds before the collision and was travelling approximately 34 mph at the time of the collision. Doc. 42-1 at 3; Doc. 55-2 at 76, 153, 160. The speed limit on Highway 150 at the site of the collision is 35 mph. Doc. 42-1 at 3.

There is some disagreement as to whether, or when, Hennigar and Willys were able to see each other before the collision. Hennigar claims that he saw Willys at the stop sign as he passed through the intersection and thought Willys would yield to him since he was operating in emergency mode. Doc. 42-1 at 5. Plaintiffs note, however, that Hennigar has provided inconsistent accounts as to when he first saw Willys, as he has stated on at least one other occasion that there was a semi-truck in the southbound lane, on the north side of the intersection, that blocked his view such that he first saw Willys' truck when it emerged from behind the semi-truck. Doc. 54 at 3. Video evidence subsequently failed to corroborate the presence of a semi-truck at that location. Doc. 47 at 131; Doc. 53 at 4. Plaintiffs claim that the two southbound vehicles that passed Willys just before he began crossing the highway likely obstructed Willys' and Hennigar's views of each other. *Id.* at 4; Doc. 55-1 at 13. Plaintiffs also question whether Willys heard Hennigar's approach, as multiple witnesses reported that Hennigar turned off his siren as he passed through the intersection and others did not hear it at all.[4] Doc. 54 at 3. Hennigar asserts that he never turned off his siren. Doc. 56-1 at 2.

Other relevant facts will be discussed as necessary.

## V. ANALYSIS

Defendants argue that they are entitled to summary judgment on several grounds. First, they argue that plaintiffs' recklessness claim against Hennigar fails, as a matter of

---

[4] The evidence is unclear as to the exact moment Hennigar turned off his emergency siren. All witnesses who have stated the siren was turned off agree, however, that the siren was off at least by the time Hennigar exited the intersection.

6

law, because (1) Hennigar's conduct was lawful under the circumstances and (2) Willys caused the accident by failing to yield to an emergency vehicle. Doc. 46 at 8–16. Second, they argue that plaintiffs' § 1983 claim against West Union fails because Hennigar's conduct did not violate Willys' constitutional rights and, even if it did, the plaintiffs have not shown that West Union failed to adequately train or supervise Hennigar.[5] *Id.* at 18–22. Third, defendants argue that even if plaintiffs can establish liability for Willys' death, plaintiffs have not provided sufficient evidence to recover for Willys' pre-death pain and suffering. *Id.* at 22–25. Finally, defendants argue that plaintiffs cannot recover punitive damages. *Id.* at 25–28. I will address these issues separately.

## A.     *Recklessness*

Plaintiffs claim Hennigar is liable for Willys' death due to his reckless driving while responding to the incident at the Westwood Apartments. Specifically, they assert that Hennigar drove far too fast under the circumstances and failed to keep a proper lookout. Defendants argue that Hennigar's actions while responding to an emergency were lawful and appropriate for a police officer responding to an emergency.

Iowa Code § 321.231 establishes certain privileges for emergency vehicles[6] responding to an emergency call.[7] For example, it permits police vehicles to ignore some

---

[5] Plaintiffs appeared to include Hennigar in their § 1983 claim in their first amended complaint. Doc. 29 at 6–7. Defendants argue that plaintiffs failed to properly raise a § 1983 claim against Hennigar in his individual capacity and, even if they had, they have failed to show why Hennigar would not be entitled to qualified immunity. Doc. 46 at 17–18 & n.5. Plaintiffs do not address whether they intend to sue Hennigar in his individual capacity under § 1983 in their resistance. Doc. 53 at 19–30. Therefore, I will only consider plaintiffs' § 1983 claim against West Union.

[6] "Authorized emergency vehicles" includes police vehicles. Iowa Code § 321.1(6).

[7] The Iowa Supreme Court has held that "[a]n 'emergency call' exists when, upon receipt of a message, the responding officer truly believes an emergency exists and has reasonable grounds

7

traffic signals and exceed maximum speed limits. Iowa Code § 321.231(3)(a)–(b). These privileges are not unlimited, however. For example, a police vehicle may proceed through a stop signal, "but only after slowing down as may be necessary for safe operation," and exceed speed limits, but only "so long as the driver does not endanger life or property." *Id*. These limitations recognize "that operators of emergency vehicles owe a duty to the public to drive safely," even when responding to emergencies. *See Morris v. Leaf*, 534 N.W.2d 388, 391 (Iowa 1995). Indeed, § 321.231(5) states:

> [t]he provisions of this section shall not relieve the driver of an authorized emergency vehicle . . . from the duty to drive or ride with due regard for the safety of all persons, nor shall such provisions protect the driver or rider from the consequences of the driver's or rider's reckless disregard for the safety of others.

*Id*. § 321.231(5). Because of these limitations, the Iowa Supreme Court has held that an emergency vehicle operator who harms another by reckless driving while responding to an emergency call is subject to civil liability. *Morris*, 534 N.W.2d at 390–91.

To prove recklessness under § 321.231, "a plaintiff must show that the actor has intentionally done an act of an unreasonable character in disregard of a risk known to or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow."[8] *Id.* at 391. Defendants argue that they are

---

for that belief." *Hamilton v. Town of Palo*, 244 N.W.2d 329, 331 (Iowa 1976). Neither party disputes that Hennigar was responding to an "emergency call" at the time of the accident. A police vehicle must also have either its lights or sirens activated while responding to an emergency call in order to receive the privileges in § 321.231(3). Iowa Code § 321.231(4). The parties agree that Hennigar at least had his lights activated before, and at the time of, the accident. Therefore, § 321.231 is controlling.

[8] When interpreting the meaning of reckless under § 321.231, the Iowa Supreme Court has looked to other areas of law that address reckless conduct, such as criminal law. *See Morris*, 534 N.W.2d at 390–91 (citing cases addressing recklessness in the context of punitive damages and involuntary manslaughter when defining recklessness); *Bell v. Cmty. Ambulance Serv. Agency for N. Des Moines Cty.*, 579 N.W.2d 330, 335 (Iowa 1998) (explaining that criminal

8

entitled to summary judgment because plaintiffs cannot show that Hennigar created an unreasonable risk of harm to others or that he knew, or should have known, that the accident with Willys was a probable result of his actions. They assert that Hennigar's speed was appropriate for responding to an emergency and that his path through the intersection, and beyond, was completely clear until Willys entered it unexpectedly. They also assert that Willys had a duty to yield to Hennigar and, because his failure to do so was not sufficiently foreseeable, there is no basis for finding that Hennigar's driving was likely to cause harm, even at the speed he was driving. Thus, according to defendants, Hennigar's response to the emergency call was appropriate and Willys, by failing to yield to Hennigar as required by law, caused the accident.

It is true that Hennigar, by having at least his emergency lights activated, met the requirements for a police officer responding to an emergency under § 321.231(4). It is also true that Willys had a duty to yield under § 321.324. However, these propositions do not preclude the possibility that Hennigar was reckless. Section 321.324(4) specifically provides that a driver's duty to yield to authorized emergency vehicles does not relieve emergency vehicle drivers "from the duty to drive with due regard for the safety of all persons using the highway." In addition, the Iowa Supreme Court has held that § 321.324 does not excuse an emergency vehicle driver's violations of other driving laws. *See City of Cedar Rapids v. Moses*, 223 N.W.2d 263, 268 (Iowa 1974) (statute requiring vehicles to yield to emergency vehicles did not excuse police officer's negligence in violating statute requiring all vehicles to remain in the right-hand lane of a road), *overruled on other grounds by Hoffert v. Luze*, 578 N.W.2d 681 (Iowa 1998). I have found no basis for concluding that § 321.324 excuses an emergency vehicle driver's recklessness while responding to an emergency if such conduct is not lawful under §

---

cases and workers' compensation cases "provide some aid in conceptually framing the meaning of 'reckless'" under § 321.231 even though they include different standards and burdens of proof).

9

321.231.  Therefore, if Hennigar's actions in responding to the emergency call were reckless, he may be held liable regardless of Willys' failure to yield.  The central issues remain (1) whether Hennigar's driving raised an unreasonable risk of harm to others and (2) whether Hennigar knew, or should have foreseen, that his driving raised an unreasonable risk of harm to others.  *See State v. Conyers*, 506 N.W.2d 442, 444 (Iowa 1993).

Plaintiffs have provided some evidence that suggests Hennigar's conduct raised an unreasonable risk of harm, i.e., that his conduct would more likely than not result in harm to others.  Hennigar's rapid acceleration toward the intersection of Highways 150 and 18 forced one vehicle to pull off the road out of fear of being hit.  Another vehicle heading the opposite direction also quickly pulled off the road after Hennigar crossed into part of its lane while passing the other vehicle.  Upon reaching the busy intersection Hennigar slowed little, if at all, and then turned off his siren while accelerating full throttle through the intersection.  He reached 60 mph on a stretch of highway that he knew had a 35-mph speed limit and various business turnoffs.  The data suggests Hennigar would have reached even higher speeds had he not noticed Willys' crossing as the police SUV reached 60 mph.  Even though Hennigar was authorized to exceed the speed limit while responding to an emergency, the reasonableness of his speed is debatable, especially considering that (1) Hennigar was responding to a call from the police department's business line, not a 911 call, and (2) there is evidence Hennigar's route to the apartments could have been completed in approximately two minutes while following all traffic laws, including stopping at stop signs.[9]

---

[9] Plaintiffs' expert opined that he was able to complete Hennigar's route to the apartments in approximately two minutes.  Doc. 55-2 at 150.  Defendants suggest that there is no foundation for plaintiffs' expert's testimony on this issue.  Doc. 59 at 4.  In viewing the evidence in a light most favorable to plaintiffs, however, I will assume for purposes of this motion that the expert's opinion on this matter is accurate and admissible.

10

Other circumstances leading up to the collision also leave the reasonableness and riskiness of Hennigar's driving, and particularly his speed, up to debate. *See Oehlert v. Kramer*, 205 N.W.2d 723, 725 (Iowa 1973) ("Whether excessive speed may amount to recklessness depends upon the attendant circumstances; and there are always attendant circumstances." (quoting *Lewis v. Baker*, 104 N.W.2d 575, 578 (Iowa 1960))). Most notably, there is a genuine dispute as to whether, or to what extent, Hennigar and Willys were able to see each other as Hennigar approached and accelerated through the intersection. The evidence suggests that Hennigar was approximately 375 feet away from the collision site when the CDR began recording five seconds before the collision.[10] Doc. 55-2 at 153, 160. This means that approximately four seconds before the collision, when Willys began crossing Highway 150, Hennigar had not yet entered the intersection and Willys' path across the highway likely appeared clear to him. *Id.* at 160. It also means that the two southbound vehicles that passed Willys before he began crossing the road were somewhere between Hennigar and Willys and, likely, obstructed Hennigar's vision of the turnoff on the west side of Highway 150 to some extent.[11] *Id.* at 141, 153, 160–61. How much, and how long, Hennigar's vision of the west-side business turnoff was obstructed are key issues that could affect a jury's findings regarding whether Hennigar's speed was likely to cause harm to another.

---

[10] The experts' opinions are in line with my own calculations based on the CDR data in the record. I used Hennigar's speed recorded at each half second as the average speed for that interval and calculated the distance of feet travelled during that time. Based on my calculations, the CDR began recording approximately 378 feet before the site of the accident. The police report found that the accident occurred 272 feet north of the intersection. Doc. 55-1 at 11. The report also noted that highways such as Highway 150 are 24 feet wide. *Id.* Thus, the distance from the site of the accident to the south entrance of the intersection was approximately 296 feet, so the CDR began recording approximately 82 feet before that entrance (378 – 296 = 82). These numbers are approximations on my part, made solely in an effort to understand the evidence in the summary judgment record, and are in no way intended as factual findings.

[11] The parties' experts appear to agree that any obstruction preventing Hennigar from seeing Willys cleared at least three seconds before the collision. Doc. 55-2 at 141, 153, 160–61.

Even if a jury could find that Hennigar's conduct raised an unreasonable risk of harm to others, however, that would not necessarily mean it was reckless. Recklessness is something more than "the mere unreasonable risk of harm in ordinary negligence." *Bell*, 579 N.W.2d at 335 (quoting *Thompson v. Bohlken*, 312 N.W.2d 501, 504–05 (Iowa 1981)). It is proceeding to act in a negligent manner despite knowing, or reasonably foreseeing, that harm is highly likely to occur. *See id.* at 335–36; *see also State v. Sutton*, 636 N.W.2d 107, 112 (Iowa 2001) (recklessness is "conduct so obviously dangerous that the defendant knew or should have forseen [sic] that harm would flow from it"). It is this conscious disregard for, or indifference to, the rights and safety of others that elevates conduct from negligence to recklessness. *Bell*, 579 N.W.2d at 336; *State v. Torres*, 495 N.W.2d 678, 681 (Iowa 1993).

Based on the record before me, no reasonable jury could find Hennigar knew, or should have known, that his driving was so obviously dangerous that it was likely to cause an accident. Hennigar's lane was clear as he approached and accelerated through the intersection. He did not know, nor was it reasonably foreseeable, that a vehicle was likely to pull into his path. Because Hennigar was driving in emergency mode leading up to the accident, nearby vehicles were obligated to yield and it was reasonable for Hennigar to believe that they would do so. *See Bell*, 579 N.W.2d at 337–38 (agreeing with the trial court's finding that an ambulance driver did not have "a conscious knowledge of a dangerous situation" when other vehicles had yielded to him and his path through an intersection appeared clear). His speed while in emergency mode, on its own, was not so excessive as to be considered reckless when his path was clear and could reasonably be expected to remain so. *Whiting v. Stephas*, 74 N.W.2d 228, 231 (1956) (the speed of a vehicle, on its own, "is seldom of controlling significance" on the issue of recklessness).

The only way Hennigar could possibly have foreseen that a nearby vehicle was likely to fail to yield to him is if he knew, or had reason to know, that such a vehicle was

12

completely unaware of his approach. Plaintiffs essentially argue that this was the case because Hennigar's sight of Willys was obstructed to some extent, at least momentarily, and Willys likely could not see Hennigar's SUV as it began crossing the highway. Whether Willys could actually see Hennigar at that point is not the issue, however. The material issue is whether *Hennigar* knew, or had reason to know, that a nearby driver, such as Willys, was likely to be unaware that he was approaching. While a momentary obstruction to Hennigar's vision should have alerted him of the need to proceed with more caution, there is insufficient evidence to find that proceeding as Hennigar did constituted recklessness. *See Vogel v. Reeg*, 225 N.W.2d 132, 137 (Iowa 1975) (finding driver was "momentarily negligent," but not reckless, when he failed to keep a proper lookout and failed to yield one-half of the road upon meeting an oncoming vehicle); *Hazelo v. Mesenbrink*, 469 F.2d 252, 254 (8th Cir. 1972) (holding that "momentary inattention or inadvertence, in itself, [was] insufficient to generate a jury question of recklessness" under Iowa's now-repealed guest statute).

Iowa courts typically require a far more certain knowledge of risks, and level of danger, before finding that a defendant was reckless. *Compare State v. Klatt*, 544 N.W.2d 461, 463 (Iowa Ct. App. 1995) (finding driver was not reckless when he tried to pass two semi-trucks on the highway and could not see an approaching vehicle after trying to make sure his path was clear and while driving at an appropriate speed), *and Pieper v. Harmeyer*, 235 N.W.2d 122, 129 (Iowa 1975) (finding insufficient evidence of recklessness when a driver collided with vehicles stopped at the bottom of a hill even though the driver could not see what was on the other side of the hill as he sped toward and over it), *with State v. Abbas*, 561 N.W.2d 72, 74 (Iowa 1997) (finding driver reckless when he caused an accident while trying to pass two vehicles on the highway because he was speeding, tried to pass despite obscured visibility and "did not abort his attempted pass when oncoming cars appeared"), *and Oehlert*, 205 N.W.2d at 725 (holding that a

13

jury could find driver was reckless when he drove at speeds up to 90 mph in a 50-mph zone at night on a road he knew contained four curves).

Further, even if Hennigar and Willys could not see each other for a meaningful amount of time before the accident, the fact remains that Hennigar's approach was signaled by his emergency siren. Hennigar ran the siren for several seconds before turning it off while crossing through the intersection a few seconds before the collision. While there is a genuine dispute as to whether Willys and other nearby vehicles heard the siren as Hennigar approached, this again is not the material issue. The question is whether Hennigar knew, or should have known, that nearby vehicles would not have heard the approach of his siren. Plaintiffs have provided no evidence that he knew or had reason to believe that vehicles within 300 feet of the intersection – where Willys was waiting to cross the highway – would not have heard it. *See Bell*, 579 N.W.2d at 337–38 (no danger was apparent to ambulance driver when there was evidence that other vehicles in the vicinity of the accident heard or saw ambulance's approach). As such, he had no reason to foresee that a vehicle failing to yield to him was probable.

Because Hennigar had no reason to believe that nearby vehicles did not hear or see his approach, his assumption that nearby vehicles would yield to him, and thus keep the path directly ahead of him clear, was reasonable. Similarly, because Hennigar did not have reason to believe that any nearby vehicle, seen or unseen by him, was unlikely to yield, he did not know that his driving was likely to result in harm to another. Thus, even if Hennigar's speed under the circumstances was unreasonable and negligent, no reasonable jury could find that his driving was reckless under Iowa Code § 321.231. Defendants' motion for summary judgment on this issue will be granted.

### B. *Section 1983 Claim*

Plaintiffs argue that West Union is liable for Willys' death under 42 U.S.C. § 1983 because its failure to adequately train and supervise Hennigar resulted in Hennigar

14

driving recklessly and depriving Willys of his constitutional right to life.[12]  Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Section 1983 was designed to provide a "broad remedy for violations of federally protected civil rights." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 685 (1978). Section 1983, however, provides no substantive rights. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994); *Graham v. Conner*, 490 U.S. 386, 393–94 (1989); *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979). "[O]ne cannot go into court and claim a violation of [42 U.S.C.] 1983'—for [42 U.S.C.] 1983 by itself does not protect anyone against anything." *Chapman*, 441 U.S. at 617. Rather, Section 1983 serves as a vehicle for plaintiffs to vindicate rights that exist under other bodies of law such as the Constitution and statutes. 42 U.S.C. § 1983; *see also Albright*, 510 U.S. at 271.

Defendants argue that they are entitled to summary judgment on plaintiffs' § 1983 claim for two reasons. First, they argue plaintiffs' failure to train or supervise claim fails because they have not shown that Willys' rights were violated. They note that failure to train and supervise claims fail under Eighth Circuit law without an underlying constitutional violation. Second, even if there was a constitutional violation contributing

---

[12] In their motion for summary judgment, defendants argue that plaintiffs failed to properly raise a § 1983 claim against Hennigar. Doc. 46 at 17. In their resistance, plaintiffs discuss only a failure to train and supervise claim against West Union. Doc. 53 at 19–30. Therefore, to the extent plaintiffs attempted to assert a § 1983 claim against Hennigar, that claim has been abandoned.

15

to Willys' death, defendants argue that West Union's training and supervision were sufficient to avoid liability.

The first question is whether a reasonable jury could find that Willys' constitutional rights were violated when he died. When no other specific constitutional or statutory violation is alleged, a deprivation of life claim under § 1983 is cognizable as a Fourteenth Amendment substantive-due-process claim. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 842–43 (1998). A state actor's deprivation of another's life violates due process when it is "arbitrary," but "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *Id.* at 845–46 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 129 (1992)). Only "conduct 'that shocks the conscience' and violates the 'decencies of civilized conduct'" is actionable as a substantive-due-process violation under § 1983. *Id.* (quoting *Rochin v. California*, 342 U.S. 165, 209-10 (1952)). "Mere negligence is never sufficient" to show an unconstitutional deprivation of life under the Fourteenth Amendment. *Terrell v. Larson*, 396 F.3d 975, 978 (8th Cir. 2005), *as corrected* (Mar. 23, 2005) (en banc). "Proof of deliberate indifference" to an individual's rights is sufficient in some situations, but "only when actual deliberation is practical." *Id.* (quoting *Lewis*, 523 U.S. at 851). When state actors are in "rapidly evolving, fluid, and dangerous situations" where time to reflect is absent, proof of an intent to harm another individual is usually required to show a due-process violation. *Id.* (quoting *Neal v. St. Louis County Bd. of Police Comm'rs*, 217 F.3d 955, 958 (8th Cir. 2000)).

In light of my finding that Hennigar was not reckless, plaintiffs have alleged no constitutional violation to support a § 1983 claim against West Union. Indeed, under *Lewis*, even if Hennigar's conduct had been reckless, there would still be no constitutional claim. The circumstances leading up to the accident were rapidly evolving and did not provide Hennigar with an opportunity to reflect on, or deliberate over, the appropriateness of his actions. As such, to have a viable constitutional claim plaintiffs

16

would be required to show that Hennigar intended to cause Willys harm. They have made no such showing. Therefore, defendants are entitled to summary judgment on the § 1983 claim.[13]

## VI. CONCLUSION

For the reasons set forth herein:

1. Defendants' motion (Doc. 42) for summary judgment is **granted** in its entirety.
2. The trial of this case, currently scheduled to begin February 8, 2021, is **canceled**.
3. Judgment shall enter against plaintiffs and in favor of defendants and the Clerk's office shall **close this case**.

**IT IS SO ORDERED.**

**DATED** this 20th day of November, 2020.

_____
Leonard T. Strand, Chief Judge

---

[13] Because plaintiffs' claims fail as a matter of law, there is no need to address the damages arguments briefed by the parties.